So, Mr. Benjamin, are you leading off? I am, Your Honor, and may it please the Court. As to the reasonable doubt presumption of innocence instructions, first as to the Teague issue, Cage's constitutionalization of the Reynolds decision is illustrated by a set of Second Circuit cases. There are two pre-Cage cases which uphold the instruction. Then Cage is decided. Then there is one post-Cage case. Excuse me, counsel, just for my benefit, so is this simply a continuation of the argument that we made in the last case with respect to Baldwin? Yes, Your Honor. And the issue is identical. I mean, the instructions are identical. There are one or two instructions that are different, but they're substantially similar. Okay. I grant you that. I just wanted to illustrate how Cage constitutionalized Reynolds, because in the Second Circuit, in the first Second Circuit case that dealt with this instruction and actually cited Cage, relied upon Cage and found constitutional error. And that's my point, that the Reynolds case is now constitutional error post-Cage. As to the structural error issue, we know that Sullivan clearly applies to beyond a reasonable doubt instructions. Now, 17 and 22, 22 in this case, 17 in the Baldwin case, talk about both the presumption of innocence and the beyond a reasonable doubt standard. So Sullivan applies by his very terms. Moreover, this Court has recognized that the beyond a reasonable doubt standard is simply the converse or another way of articulating the presumption of innocence. So there's no principled way to distinguish this case from Sullivan, and thus its structural error. The other jury instructions in this case do not cure the error in number 22. And I'm not going to repeat what I previously argued. I will add that the instructions which tell the jury to decide the case solely upon evidence presented to it does not cure the error in number 22. And the reason is those instructions limit the source of information from which the jury can make its decision. Number 22 reduces the quantum of evidence needed in violation of Cage. In light of those, I will rest on my other argument and I'll turn the rest of my time over to Mr. Lowy. Thank you. Thank you, Mr. Benjamin. Mr. Lowy. Thank you, Judge. Mr. Lowy, before you get started, I have kind of an off-the-wall question, which I would appreciate your views and the views of Mr. Anderson. And that is, it is my understanding that there is still an outstanding petition, post-conviction review petition, before the Idaho Supreme Court raising the ring issue on remand from the Supreme Court such that the Idaho Supreme Court in this case could decide to apply ring retroactively for its own State purposes. Is that correct? That is correct. Well, if that's correct, then should this Court defer reaching any sentencing issues in this case? I believe this Court should. Indeed, this Court might choose to use its resources and defer all issues until the Idaho Supreme Court decides. If it decides to apply ring retroactively, as this Court is well aware, cases have a tendency to get resolved short of hearings oftentimes, and certainly with cases which are of significant age. And I think that this one certainly counts as that. So that's my response, Judge. Thank you. Sure. If I can just, I guess, add a few comments. We argued that case, I believe, in the time frame. In August-type range? I'm sorry? In August, more or less? What, when? August or so? I believe it was after August. I think it was argued in August or thereabouts. You know what? I'll take your word on it. It was certainly argued sometime in the latter half of 2009, and I think both opposing counsel and I are eagerly awaiting the decision. The Idaho Supreme Court, I take it, doesn't have a 90-day kicker like the California Supreme Court does? If it does, it also has the ability to ignore it. Okay. I'd like to address three issues, perhaps only two. Penalty phase, IAC, Brady, and IAC with respect, again, to the PGM issue, which we dealt with briefly in the Haddon matter. I'd like to cut to the chase with the IAC question. I'm going to, unless there are questions from the court on the deficient performance with regard to investigation, I'm going to not speak to that. That's briefed. I rely on the briefing. But I do want to speak to the declarations from Dr. Beaver and Dr. Stewart. And I really want to simply alert the court to the places in Dr. Beaver's declaration, which I think do more than simply theorize. And then I'd like to make a few other comments on mitigation generally. On page 16 through 17, and I'm quoting, we see this. The alcoholism and suicide seen in the past generations of Paul's family very likely play a genetic role in the emotional and mental health of Paul and his siblings. And it cites there to Sadock and Sadock's comprehensive text of psychiatry. However, since we all seek role models from our elders, the alcoholism and suicide of past generations take a toll on more recent ones. Given the role that alcohol played in past generations, it is unsurprising that illicit drugs and alcohol were prominent in the lives of Paul, his siblings, and his cousins. Then it goes on. On page 22. As Paul grew up, everywhere he looked there was alcohol and drug abuse. It should come as no surprise then that Paul, too, abused drugs. On page 23. In addition to the alcohol and drug abuse which surrounded Paul and to which he succumbed, Paul was exposed to physical violence and emotional abuse. August and Pauline, his parents, reportedly beat up at least some of the children. In addition, even if only some were beaten up, a parent physically abusing anyone in the home has serious negative effects on all the children in the house. Being witness to abuse as a child can be as damaging as being the victim of abuse. Not only do children learn to model violent behavior, most children develop a sense of helplessness about the world. The world appears to be hostile and brutal, what little one can do to change things. This further discourages a child from trying to change their life and behaviors. On page 27. Actually, excuse me, on page 39. The conclusion is a conclusion about Mr. Rhodes' family context, which, quote, deprived him of normal development. Paul was exposed repeatedly to violence, drug and alcohol abuse and sexual abuse. Also, he grew up in a family in which legal problems were the norm. He had no opportunity to develop normal behavior and coping mechanisms. Paul Rhodes' own medical problems, polio and its aftermath, further limited his potential as a human being. It is therefore not surprising that Paul Rhodes had chemical dependency issues with no resources to resolve them. It is likewise unsurprising that he knew little about normal sexual and interpersonal relationships. Paul Rhodes was a damaged human being with little opportunity to be a healthy adult. It continues with similar language. Dr. Stewart notes that Paul's family history, and this is on page 16, is overwhelmingly positive for mental illness. This places him at severe risk for developing his own mental health conditions. And, again, at page 20, he diagnoses Paul with PTSD, though, as opposing counsel has noted, notes that he is unable to satisfy the requirements of the DSM-IV, but nevertheless diagnoses him to a reasonable degree of medical certainty. We're not after trying to get, in presenting mitigation, we don't need to be after getting a diagnosis. The diagnosis follows from the rich material which we have presented in our proffer, if you have that rich material. We aren't trying to prove a statutory mitigator. Mitigation, of course, is anything which weighs in favor of life. Surely, a diagnosis can be helpful, but that doesn't mean that you have not made a colorable showing, because you do not have a diagnosis. And, in fact, the fact that you have a diagnosis doesn't mean that the fact finder has to accept it. The fact finder is not bound by the diagnosis. Presumably, the fact finder could conclude that this kind of background would almost certainly lead to someone with critical mental health problems. We do that in ordinary life all the time. We do that when we think about war veterans coming back from Iraq. We do that when we think of people who observe people jumping off the World Trade Center. We do that when we think about people growing up in these circumstances outside of the context of a courtroom. I don't think that it is a stretch at all to suggest that without a diagnosis, this mitigation is weighty. And our position is, of course, that this mitigation would, there's a reasonable likelihood that the outcome would have been different at sentencing had the court been aware of it, and it wasn't. Contrary to what opposing counsel has said earlier this morning, while the court was aware that there was drug abuse, it was not aware of what led to that drug abuse and the degree of drug abuse. I'd like to turn to Brady. There are three. Counsel, before you turn to Brady, could I ask you one question on the penalty phase? Yes. In your proffer, is there evidence about not just incest in the family, but of incest in which Rhodes himself was involved? In Paul Rhodes himself? Yes, there is evidence of incest with Paul Rhodes himself. With one of his sisters? There's actually a number of instances. There's an instance recounted in one of his sister's affidavits. I believe that it is Theresa Rhodes' affidavit, and it is relied on by Dr. Beaver and described in Dr. Beaver's declaration, of an instance when she was a young girl. I can't remember exactly how old. She and I believe her sister Roberta, Paul's sister Roberta, and a bunch of cousins were over at the cousins' house. This was a family which were always at one another's houses. No adults were there, no surprise there. Theresa was, and I may be mixing it up, but maybe Roberta, not Theresa, and forgive me if I'm wrong, but whichever it was. Everyone else, and everyone else was not the same age range. There were older kids, older teenagers, like 18, 19, and everyone was naked in the back bedroom, and there were two, I believe, females, and they were going around and they were having oral sex with the males. These are all related to one another. Paul, at this point, is a kid as well, not one of the older teenagers. So there's an example. So what did your expert in the proffers say was the significance of this for the sentencing decision? Well, what the expert says is two things about that, maybe more than two things. One is he says it's an indicator of obviously terrific dysfunction within the extended family as well as the immediate family. It is an indicator of Paul's having received very abnormal guidance from parental guidance, and not only at that point, leading up to that point, but also later, and that comes through Teresa or whoever, Teresa or Roberta, the person who left and went home, who wanted to speak about it with someone who came to the house, another cousin, and the cousin said, oh, just forget about it. You know, essentially shove it under the rug, which is something you see repeatedly, and Dr. Geaver noted that this is a repeated strategy within this family. It's a terrifically unhealthy strategy because the kids, and specifically with regard to sexual dysfunction, were forever being told, either I don't believe it happened, I don't believe that an adult actually molested you, or, and or, forget about it. With regard to our own daughters, Paul's sisters, essentially contemporaries, Pauline, mom, said, you know, figure it out, after her daughter had been molested by her uncle. The significance is it leads to someone with a horrifically unstable, and I don't recall the word exactly that Dr. Beaver used in his declaration, but an unstable view of the world. Thank you. There was, as you noted, of course, the incest with the sister, and there was also incest with an aunt, Annie, and these are also in the affidavits noted in Dr. Beaver's declarations. If I can move quickly to the invocation issue. Judge Gould, I think you, in the last argument, were asking whether this was actually raised as a Brady issue, and I don't know, but I'm guessing you might have been wondering that in this argument. Certainly, opposing counsel suggested so. Our position is we did raise it as a Brady issue. We raised it as a Brady issue in the motion for an evidentiary hearing. It's nested within the substantive issue. We say we just got this. We could have known it. We did cause and prejudice analysis with this. We couldn't have, we, you should let us bring this in. You shouldn't cut us off on this claim. We didn't know about this. Look, you actually raised three, in this case, you actually, in terms, raised three Brady, or two Brady claims, I guess, one with respect to the Buchholz confession and the other with respect to Browning. As I have read it, you are arguing the merits of the invocation of the right to silence and didn't make any kind of Brady claim with respect to withholding of that information. Is that wrong? I mean, I could have missed something. It is wrong to this extent, Judge. It is wrong to the extent that we raised in our motion for an evidentiary hearing the fact that we argued that the invocation wasn't revealed until Shaw's deposition the district court in its memorandum decision in order regarding the motion for an evidentiary hearing cited to where we argued in our motion for an evidentiary hearing that the invocation wasn't revealed until late and the court found that it didn't constitute cause and prejudice. The court reasoned that it didn't constitute cause and prejudice because Roge was a participant in the events giving rise to those additional facts. This is all Brady analysis. So those facts were known to the defense all along. And that the defense was negligent because they could have developed the facts through cross-examination of Shaw at trial, and we'll just forget about Banks v. Dredke. In each instance here, the district court was clearly rejecting Mr. Roge's claim that the state's concealing the invocation until Shaw's federal court deposition didn't constitute cause and prejudice, and at the heart of this is Brady. Also, just as we're arguing three cases here, these cases were all being argued in front of not a panel but a single judge. That judge entered more than one ruling with joint, a single ruling with joint case numbers on it. No one in the lower court misunderstood what the arguments were. It just can't seriously be questioned whether our argument was raised as a Brady claim nested as it was within the substance of argument. We needed to get, of course, to the Shaw report. We need that invocation to win the claim. The Kevin Buchholz confession to the Baldwin murder. The state revealed only the summary Newbold report, which was a summary of the confessions that Buchholz gave to two other officers. Failed to reveal that there in fact were three separate confessions to two different officers. Failed to reveal that Buchholz had failed the polygraph. The district court ruled that because the Buchholz information wasn't admissible at the Mickelbocker trial and didn't lead to admissible evidence, there was no Brady violation. But the polygraph may have led to evidence that Buchholz was involved in the Mickelbocker murder because the polygraph report that we've got in the record is on Idaho Falls Police Department, a shared report and report page in Idaho Sheriff's Office report, and it has Mickelbocker as the victim. And there is where it says that Mr. Buchholz was not being entirely truthful. So either there's another polygraph hanging out there, which we've never heard about, or this is the polygraph result and it may have led us to direct question, to evidence of direct questioning about Mickelbocker, not merely about Baldwin. It was relevant. It's pretty far afield, though, counsel, because the evidence that they did have from Buchholz only related to the Baldwin murder. And there isn't anything that tied it directly to Mickelbocker, other than the fact that it may have been in a file or something that said Mickelbocker. I think this is what ties it directly. The state's ballistics expert found that the same gun was used to shoot the bullets, which killed each victim in each of the three cases. And in fact, despite the recent NAS report, the state's ballistics expert found, in at least one instance, that this was the gun to the exclusion of all other guns. That's the tie-in. And how does the Buchholz polygraph relate, or the Buchholz confession relate to the gun? Just because Buchholz said I shot Susan Baldwin twice in the back, and you think that that was information that only Buchholz could have had, or only the murderer would have had, because he couldn't have got it from the news report. I mean, this is the same argument that you made in Baldwin. You're interpreting here saying, well, if we could show that he did the Baldwin murder, and the same gun was used here, then we would show sort of by some law of transitivity that he must have done this one as well. Not that he must have done this one, but that a jury could have had reasonable doubt that Mr. Rhodes did this one. Counsel, if you had tried to introduce Buchholz in this case, wouldn't that have opened the door for the prosecution to – I mean, wouldn't it just have been inevitable that the wall that was built between the Mickelbocker case and the Baldwin case would have had to have come down? I think that's true. And the district court didn't think very much of the theory and thought that that would have been very, very prejudicial. And my question is, is if counsel had pursued the theory that you are asking for here, and that it had not turned out well for your client, been convicted in the Mickelbocker case, wouldn't you be here claiming that this was ineffective assistance of counsel to have lowered that wall and to have introduced evidence of the Baldwin murder in the Mickelbocker trial? No, not in this case I wouldn't. And the reason I wouldn't is because we have a confession from a third party who has a fact which he could not have gotten from the papers, who has a criminal record which includes violence, who in a case in Baldwin where Mr. Rhodes does not fit the eyewitness description, the guy who, according to the prosecution, was running out of the mini barn, Mr. Rhodes having polio, as is noted in a number of people testifying in the trials, was not a runner. Running out to the pickup and taking off doesn't fit the, it's not clear to me at all that it would have been so terribly prejudicial. In fact, it might have been a very smart move. Counsel, you had already, by the time you got to the Mickelbocker trial, you had already had the Baldwin jury verdict, is that correct? That's correct. Okay. So you would have known at that point that, you should have known at that point or would have known at that point that Buchholz wasn't going to work. Well. It didn't work before one jury. Right. It didn't work before with one jury and one really bad investigation. Because, in fact, the reason it didn't work is that the trial court was relying on not just misrepresentations and omissions that needed to be proved from external evidence. It was relying on stuff that was coming out that contradicted what the prosecuting attorney said that had already come out in the record in the Bingham County case. In addition to which, had the trial attorneys done their homework on Buchholz and on the confession and noted, for example, to the trial court that, oh, you know what? Those two bullets in the back? Couldn't have gotten those out of the newspaper. That's a pretty compelling fact. I'm not so sure the trial court would have said so quickly or at all, actually. Oh, Buchholz isn't coming in. So it's not clear to me that the falling of the walls would be necessarily a bad strategy. And this is a case where there was not a terrific amount of investigation done. There was one forensic expert in Mickelbocker who was a jack of all trades. He did everything. And if you read the depositions by trial counsel, they were really put in a jam. Because if they put him in on one thing, that meant he might be crossed on another thing, which was bad. Rather than try to get individual experts to do proper investigation. So I don't think that the falling of that wall is the conclusion about the falling of that wall that other courts have come to is wrong, is correct. Counsel, you're down to about two and a half minutes. I am. I hope that you'll address the serological evidence before you sit down. All right, thank you. Before I jump to the serological evidence, let me just note, in addition to the opening and closing arguments with the invocation materiality, there's also voir dire in Mickelbocker by the prosecution that they didn't have their best witness. Their best witness was dead. Thereby setting up the actual jurors for, of course, the confession evidence. Now, the IAC on the PGM testimony. As I noted earlier today, really the difference between the FBI and the state testing is between confirmatory and field testing. The FBI testing gutted the state's testing. What happens at trial is that the FBI, excuse me, the state's expert testifies only to the state's testing. The state sits on its heels, doesn't do anything, doesn't bring out the FBI testing at all. In Mickelbocker, trial counsel simply asked about the FBI testing. The state's witness said, I can't speak to that because I didn't do the testing, and dropped it. Did not impeach using the FBI report. Did not, was not prepared to impeach using the FBI report. And based on the affidavits we have in the record, any serologist in 87 would have agreed that the FBI testing gutted the conclusion that Mr. Rhodes was, as the prosecutor put it in his closing argument, a match. I don't know if I've addressed your question, Judge Biby, but I've got three seconds. Actually, I'm over six seconds. Thank you. Okay, thank you. Your time was used up, but we will give you two minutes extra for rebuttal, if you want to think about that. Initially, Your Honors, I would like to address Judge Reimer's question regarding Ring. It's true that Rhodes still has an appeal regarding Ring and retroactivity under state law. It was argued in August of last year. And if I'm honest with the Court, and I will be, the length of time that the Supreme Court's taking has made me very nervous. I candidly do not know what they're going to do with that issue. I've talked to defense attorneys and prosecutors alike about what's going on, and I've heard all kinds of things, and I think when we get that decision, we'll know what the Supreme Court's going to do. But as to Judge Reimer's specific question of should the Court defer deciding this case, I'm well aware. Yes, Your Honor? Could I ask whether we should defer deciding the sentencing issues? Yes, Your Honor, and because counsel addressed both, I was going to address both. I'm certainly aware of this Court's enormous caseload, and I would suggest yes. As to the sentencing issues, it would be appropriate to defer or at least wait until the Idaho Supreme Court rules on Ring, because if Rhodes has got to be resentenced, there's no reason for this Court to go to the mental gymnastics of writing a decision on the sentencing issues. As to the guilt phase, absolutely not. There's no reason that this case can't go forward and should not be delayed as to the guilt phase questions. Counsel discussed the instructions, Cage. I think the Court understands my argument, and I'm going to move on with that. As to the mitigation issues, the trial court in this case and Judge Bivey, I'm not 110% certain, but it's my recollection that Mikkelbacher was tried before Baldwin. Certainly Mikkelbacher or Rhodes was sentenced in Mikkelbacher prior to being sentenced in Baldwin, because the trial court in Baldwin specifically referenced that Rhodes had been convicted in both the Mikkelbacher and the Haddon cases, and had received the death penalty in the Mikkelbacher case. So it's my recollection that Mikkelbacher was actually tried prior to Baldwin. It went Mikkelbacher, Baldwin, and then they decided what was going to happen in Haddon, and that's when the plea was entered. And the district court in this case was not so concerned about the number of murders that had been committed, because Rhodes hadn't yet been convicted of those other two murders. He was certainly concerned with his prior record. But the primary focus, I'll move back, the primary focus of the district court's decision to impose the death penalty in this case was based upon the nature of the crime. And there's nothing wrong with doing that. As recently discussed by the Supreme Court in Long v. Belmonte's, it is hard to imagine expert testimony and additional facts about Belmonte's difficult childhood outweighing the facts of McConnell's murder. As with this case, it is difficult to comprehend that the death penalty would not have been imposed in this case, irrespective of the proffer that was made. In fact, in the trial court's findings on the death penalty, the court discussed the repeated nature of Susan being shot, the brutality with which she was shot, that she struggled to escape, that Rhodes had to reload the gun at least once. The length of time from the kidnapping until she was left to die, she was kidnapped sometime prior to 7.30, because there was a witness that saw her, I believe, saw either her, the man, or Rhodes at 7.30 a.m. when she was supposed to be going to school. And then, of course, the time of death was determined to be late that night. The trial court went on, the most depraved of all types of murders. No, the victim's body was not mutilated, dismembered, or bludgeoned after her death. What occurred was worse. Death must have come as a welcome relief to Susan. If ever a situation warranted the death penalty, it is clearly manifest in this case. This was an extraordinary set of events that started early in the morning with a random kidnapping. No evidence Paul Rhodes knew who Susan was, or for that matter, knew any of these victims. And the things that she had to have gone through during that day, and then went to prior to her murder, or arguably after her murder, are unspeakable. This is an extraordinary, extraordinary murder. And on that basis alone, this court can affirm, because that proffer isn't going to overcome that. It's just not going to happen. This case is, I would submit, even stronger than the case in Pizzuto that this court decided. I would submit the Pizzuto evidence. The proffer in Pizzuto was stronger than what we have in Rhodes. There were definitive diagnoses submitted as part of the proffer. I would argue that the murders in Pizzuto, yes, there were two of them. And Pizzuto, of course, took a hammer, a ball-pin hammer, and smashed their skulls. But those two victims, while that was an extraordinary murder also, those two victims weren't subject to what Susan Michelbacher was subject to. And, of course, this court concluded that there was no need for an evidentiary hearing in Pizzuto, and that the proffer simply did not warrant an evidentiary hearing in that particular case. On the issue of incest, Judge Gould, there's certainly testimony in the record that Radin, that was one of Rhodes' trial attorneys, interviewed Rhodes regarding the incest issues, and Rhodes simply refused to talk about it. Nevertheless, Radin was able to find out about the issue, and I will candidly admit to the court that I'm not 100 percent sure whether when I say issue, whether when Radin testified about the issue, whether he's talking about Rhodes being involved in incest or other family members. But Radin said that he made a tactical decision not to introduce this evidence because Rhodes didn't want it disclosed with his family members in court. You can't have ineffective assistance of counsel when counsel is aware of this issue and makes a tactical decision based upon a request by his client. It simply doesn't work. On the issue of drugs, and I think I've alluded to this already, just to make sure that I'm clear. Yes, and the need, actually it's the need for a diagnosis. I candidly admit it's not necessary to have a diagnosis to present mitigation. But what I'm saying is that lack of a diagnosis, and the inability of two experts to come to a definitive conclusion on a diagnosis, particularly the PTSD that doesn't meet the DSM-IV requirements, simply diminishes the power of that mitigation and becomes fairly de minimis. Experts can come in and say, yeah, I think, may, whatever. Yes, the court, a trial judge, a jury now with Ring, should be permitted to hear that evidence. But it's a very, very, very little, well, it's significantly less significant. The question of the invocation in Brady, I have a real problem with a contention that a claim is nested within the substantive issue. Because that's not what this court has mandated as far as pleading requirements. I think we've thoroughly discussed that in our brief. The issue has to be raised, not in a motion for an evidentiary hearing, but in the petition. And we have not heard even today that this claim was ever raised within the confines of that petition. It was based exclusively upon Rhodes' Fifth Amendment right to remain silent, not Brady. Irrespective, I think that even if this court were to conclude that it is there, nested within the substantive issue, I believe I've discussed why that issue has no merit whatsoever. Buckholtz' confession, the polygraph, counsel said, may have led to information regarding Mikkelbacher. That's nothing but rank speculation. There's not a scintilla of evidence establishing that the polygraph or anything else regarding that confession would have been tied in to Susan Mikkelbacher's murder. That evidence was excluded for a reason. It was unreliable, as I've already discussed. Counsel says that the ballistic ties in all three murders. There's no question about that. Same gun. Ties them in. Which is arguably the most damning piece, not arguably, it is. The ballistics testing in this case is the most damning evidence that there is, because there's no connection between Buckholtz and that gun. That gun was found not, Rhodes didn't actually possess it, but within feet of where it was found where Rhodes was at. There's no question, no question that Rhodes had the gun that killed all three victims in this case. As to the NASA report and ballistics testing, I'm troubled by the citation of that report. Quite frankly, the people involved there, if you read the entirety of that report, nowhere, nowhere in the report does it say that ballistics testing is now no longer good testing. You can't use ballistics anymore. It makes suggestions on how we can improve things, but Rhodes has not cited a single case where, based upon that new NASA report, that suddenly ballistics is unreliable or isn't being considered by the courts. Ballistics testing is still very viable. There have been some responses to that report that I haven't cited, but it's one report, and I don't even believe it's been subject to peer review at this time. In any event, it doesn't stand up. Judge Bybee, the admission of the Buchholz confession would have opened Pandora's box, and as the Supreme Court discussed again, it was in Belmontese. I believe it was in Belmontese. Just a moment. Belmontese, of course, counsel was trying to keep out in the mitigation phase evidence of another murder, and the United States Supreme Court explained, here the worst kind of bad evidence would have come in with the good. The worst kind of bad evidence was the other murder that counsel was trying to exclude. Respectfully, I don't know of any attorney that would have wanted evidence of those other murders to come in, particularly with the ballistics testing that we had. And respectfully, again, I submit that it would have been. There would have been a claim of ineffective assistance of counsel. Now, arguably it would have been a tactical decision if counsel had decided to allow that to come in, but I just can't fathom having all three of those murders come into the Mecklenbacher trial. I just cannot fathom that. If I could have just a moment. As to the serological evidence, I don't think it can be overstated that counsel had an expert. Rhodes had an expert at the time of the trial, I believe his name was Richard Fox, and I believe, again, it was Radin that said that he was retained to evaluate the fluid evidence, the seminal fluid, the blood, that sort of thing. They sent him everything that we had that he requested, everything that he wanted to see and look at. There was a lot of evidence that could not be refuted from a scientific standpoint, forensic standpoint, that sort of thing. And because of that, and because of other information Fox apparently had, Mr. Radin testified that Fox, quote, helped us on one area but hurt us on several others and we made a tactical decision not to call him. There's no... If counsel had believed that the serological evidence would have been favorable to them, did they have an obligation then to find a different expert who didn't know as much, let's say, about the adverse information on ballistics? Fox seemed to cover the waterfront, and if you just hired a serological expert, they could have come in and said, hey, look, the FBI is going to force you to... What had happened, it appears to me, is that they had narrowed the pool. They had narrowed it down to 16% and that the FBI was going to force them, at the very least, force the state to admit that he was only in that pool of 32% of the population rather than just 16% of the population. The PGM was going to force them sort of back up to a higher level of uncertainty. And that may be true, that it forced them back up from 16% to 32%. But as the district court found, that's not going to change the outcome in this case. And certainly, for lack of better words, Dr. Fox was at times an expert of all trades, for lack of better words. But his specialty appeared to be the serology area. Certainly he was not... He was going to be seriously impeached if he took the stand on the ballistics issue because he had previously testified that he wasn't an expert in the area of ballistics. But it certainly appeared that in the area of serology that he had the required qualifications and knew what was going on. Let me put it to you this way, Judge Bybee. If Judge Fox was even remotely qualified, at least apparently according to Dr. Hampikian's affidavit, that's their new expert, Dr. Fox should have been able to look at that FBI report and go, there's a problem here, we've got to take care of this. And we don't have that situation. They haven't submitted an affidavit from Dr. Fox saying, oh yeah, I reviewed that and I saw that there was a problem here. They haven't submitted that. All they've done is gotten a new expert that says, well yeah, based upon only the FBI report, there's a problem here. And let's assume for the sake of argument that there was a mistake here. The problem is that there's still no prejudice. And the reason I say that is twofold. First off, Wyckoff never said Rhodes was definitively the donor of the semen in the mouth. Only that he couldn't be excluded. That's not very strong testimony by any stretch. Secondly, the other evidence in this case is, again, simply overwhelming. Particularly when you consider the ballistics testimony and the eyewitness accounts that saw Rhodes and or Susan in the van anywhere from, I believe it was 7.30 in the morning until after 5.30 at night. There's simply no basis for prejudice based upon their alleged failure to retain an expert, which they did, or impeach the state's expert. If you review the testimony by the cross-examination of Mr. Wyckoff, it's very obvious, unless trial counsel were really good in serological and forensic stuff, that they had consulted with Dr. Fox. Based upon my admittedly limited experience, you simply don't ask those kind of questions without some help from an expert. And Dr. Fox was that particular expert in this case. And if I could, I want to go back just a moment to mitigation. I failed to discuss something that's very unique to this case. And that is on the mental health stuff, counsel didn't want a mental health person to testify. There was an extensive colloquy between, I believe it was Mr. Radin again and the trial court. And the trial court was quite frankly very concerned about this issue. And Radin said, no, we do not want to present this evidence. We do not want your expert or any other expert to come in here and to discuss Paul Rhoades' mental health. And one of the primary reasons for that, and this is why, Your Honor, I'm certain that the Baldwin case came after now, oops, excuse me, came after, is because the Baldwin trial was still coming up. And they didn't want anything that would come from an expert to be able to be used in that Baldwin trial. They were terrified that there was something there. Terrified presumably because Dr. Ash, who was their mental health expert, had apparently, it can be inferred at least, uncovered something that they were concerned was going to come forward. And as a result of that, they made the tactical decision and vehemently opposed the appointment of any additional mental health experts by the judge. The judge had a psychiatrist lined up even after the initial colloquy. They had another hearing. And Judge Boyle said, I've got a psychiatrist for you lined up, certified great guy. And they said no. We do not under any circumstances want this evidence in. Unless there are any further questions from the court, we would ask that the court affirm the district court in all cases in this case. Thank you. Okay, thank you. Mr. Lowy, we've added two minutes to your time. Thank you very much, Judge. It's true that Mr. Radin said he did not want any expert assistance for mitigation purposes. However, it's also true that Dr. Ash, from opposing counsel reference, was hired exclusively for guilt-faced purposes, exclusively for an insanity determination, and presented with absolutely no background information about Mr. Rhodes. Again, then, what the failure was here was a failure to investigate on Mr. Radin's part before making that decision. The primary focus of the district court was the nature of the crime. That's true. And what's also true is I misspoke earlier when I said, Judge Bybee, that the Baldwin trial was first. It was second. And what's also true is that Micklebocker, excuse me, that Mr. Rhodes was sentenced in the Micklebocker matter. On the 24th, Mr. Rhodes was convicted in the Baldwin matter on the 11th. There was not an aggravator found, which it could have been found, for a prior murder. It is difficult to imagine how death would not have been rendered, even if effective penalty counsel had been on board. I don't know. Misali, Susan Smith, there's a host of cases where death has not been rendered, where there is very strong mitigation. It's obviously a case-by-case analysis. Incest, Rhodes said he didn't want it introduced. Again, the point is investigation. There wasn't proper investigation, which would have blossomed into more mitigation regarding Mr. Rhodes. Guns travel. The gun was recovered on the 25th. The last murder was on the 19th. This court has held in the past that guns and drugs go together. Obviously, there were a lot of guns in this case. The Pandora's box, there was no third-party confessor in Belmonte's that I recall. There was in this case. The Pandora's box, in any case, is also case-specific. Fox was, as I noted before, a jack-of-all-trades. Opposing counsel agrees. It wouldn't have changed the outcome, according to opposing counsel, even if someone else had come on board. The trial prosecuting attorney emphasized that this was a match in choosing argument. This was central to their case. It wasn't the only thing in their case, but it was central to their case. And as opposing counsel notes, Fox had previously testified he wasn't an expert in ballistics, but the defense counsel used him anyway. Judge Bybee, you've got my point. My time is up. Judge Gould, thank you very much. Thank you, Mr. Lord.
judges: Rymer, Gould, Bybee